IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD T. ELLIS, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| JO ANNE BARNHART, | : | |
| Commissioner of Social Security, | : | |
| Defendant | : | No. 04-CV-3468 |

### REPORT AND RECOMMENDATION

TIMOTHY R. RICE
U.S. MAGISTRATE JUDGE

     This case presents the issue whether substantial evidence supports the Administrative Law Judge's ("ALJ") determination that plaintiff Donald T. Ellis ("Ellis") was not disabled for the closed period from December 1999 through August 1, 2001, the date he began receiving Supplemental Security Income ("SSI"). Its resolution implicates the complex interplay of how the residual effects of surgery, cancer treatment, and other medical conditions impact a claimant's ability to perform medium-level, unskilled, low-stress work. Although it is a close question, I recommend that Ellis' Motion for Summary Judgment be GRANTED and the case be remanded to the Commissioner of the Social Security Administration ("Commissioner"). On remand the ALJ should obtain the assistance of a medical expert with the ability to assess the effect of Ellis' IL-2 treatment, a renal cell carcinoma immunotherapy treatment, administered during the period at issue in Ellis' application.

     Ellis brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner. The Commissioner found Ellis was not disabled before August 1, 2001, and denied his application for SSI under Title XVI of the Social

Security Act ("Act") prior to August 1, 2001.  42 U.S.C. §§ 1381-1383.  The parties' have filed cross-motions for summary judgment.

<u>PROCEDURAL HISTORY</u>

Ellis first applied for SSI on December 10, 1999, alleging that he was disabled since July 13, 1999 because of kidney cancer, bipolar disorder, arthritis, and tendon problems in his lower leg.  The state agency denied his application.  Ellis request a hearing by an ALJ.[1]  The ALJ held a hearing on January 17, 2001, at which Ellis appeared and testified on his own behalf.  On July 10, 2001, the ALJ issued a decision finding Ellis not disabled because he was capable of performing a full range of medium exertional work.  On May 31, 2002, the Appeals Council denied Ellis' request to review the ALJ's decision.

Ellis filed a civil action in the United States District Court for the Eastern District of Pennsylvania.  (<u>Ellis v. Barnhart</u>, C.A. No. 02-5250).  On March 31, 2003, the District Court granted the unopposed Motion for Remand filed by the Commissioner, and on March 22, 2004, an ALJ conducted the remand hearing.  Ellis elected not to testify further regarding his past condition.  Richard B. Saul, M.D., a Board-certified psychiatrist, and Dr. Franklin D. Strong, a Board-eligible internist, testified at the hearing.  Bruce Martin, a vocational rehabilitation specialist also testified.

Ellis filed a second application for SSI on August 29, 2001, while the appeal of his first application was still pending.  The state agency found Ellis was disabled as of August 1, 2001.

---

[1]  As part of the agency's disability process redesign program, the Commissioner tested, in randomly selected cases such as this one, a simplified disability determination process.  <u>See</u> 20 C.F.R. § 416.1406(b)(4) (2004) ("Testing modifications to the disability determination procedures").  Accordingly, the agency permitted Ellis to request a hearing before an ALJ without seeking reconsideration of the initial determination.  (Tr. 50, 54-55).

Thus, my decision is limited to reviewing the Commissioner's determination for the closed period from December 1, 1999 through August 1, 2001.

On March 29, 2004, the ALJ found Ellis was not disabled as defined by the Act between December 10, 1999 and July 31, 2001.  The ALJ specifically considered the three areas the District Court ordered the Commissioner to consider on remand: reviewing and considering the medical opinion of Joshua H. Barash, M.D., Ellis' treating physician; redetermining Ellis' residual functional capacity, including consideration of his exertional and non-exertional limitations; and performing a complete drug and alcohol abuse analysis in accordance with the agency's regulations and policies.  The ALJ re-evaluated Ellis' claim under the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920 and found that although Ellis was unable to perform his past heavy work as a roofer, he retained the residual functional capacity to perform medium exertional work that provided for little interaction with the public or other workers and involved performing only simple and routine tasks in a low-stress environment.  (Tr. 745; 747, Finding No. 5).  The ALJ found, based on the testimony of the VE, that Ellis could have performed unskilled simple jobs as a production laborer and commercial cleaner prior to August 1, 2001.  (Tr. 746-47, Finding No. 7, 11).  Thus,  Ellis was not eligible for SSI prior to August 1, 2001.

This appeal followed.

<u>RELEVANT FACTS</u>

The factual history of Ellis' troubling life is uncontested.  Ellis was born on July 26, 1944

and was 56 years old[2] at the time ALJ's first disability hearing.  He graduated from high school in 1967 and earned eighteen to twenty college credits in sociology courses.

Since 1969, Ellis has reported earnings in only six years.  During this time period, Ellis abused alcohol, methamphetamines, cocaine, PCP, and LSD.  The most he ever reported earning in one year was $1,756 in 1987.  He last worked regularly when he was self-employed in building maintenance and roofing in 1989 and stopped working because he went to prison.[3]  The VE testified that Ellis' past work as a roofer involved "unskilled heavy exertional work."[4]  Ellis was incarcerated continuously from October 1989 to August 14, 1999.  In January 2001, he earned a small amount of money mixing sound tracks as an audio engineer in his own recording studio with his son.  (Tr. 42-43).

Ellis' physical impairments are multitudinous.[5]  In 1981, Ellis suffered a gunshot wound that would cause a history of secondary abdominal trauma.  He has complained of chronic right knee pain since 1991.  On January 28, 1998, he underwent surgery to remove his gallbladder, and on December 12, 1998, he underwent hernia surgery.

In the spring and summer of 1999, Ellis began to lose weight without explanation and by the beginning of June he was down to 169 pounds from his usual weight of 202 pounds.  On June

---

[2] Under the Social Security Regulations, Ellis is considered to be a person of "advanced age."  20 C.F.R. Pt. 404, Subpart P, App. 2, §§ 200.00.

[3] Although Ellis claimed that he was sent to prison 1989 for third-degree murder, the record appears to indicate that he was incarcerated for sexual abuse of his daughter.  (Tr. 154, 703).

[4] "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds."  20 C.F.R. § 416.967(d).  "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 416.968.

[5] As neither party disputes the ALJ's determination regarding the limitation imposed by his mental impairment, I shall focus on Ellis' physical condition as it relates to whether he was disabled before August 1, 2001.

9, 1999, a CT scan of Ellis' abdomen revealed numerous foreign bodies in his upper abdomen consistent with buckshot. Some of these foreign bodies were located within his liver and right kidney. There was also evidence of renal cell carcinoma in his right kidney and a mass above that kidney that was consistent with metastatic disease.[6] (Tr. 274-75, 658-60). On June 13, 1999, Ellis had his right kidney removed. His surgeon, Raj G. Kansal, M.D., noted that Ellis tolerated the procedure well. (Tr. 105-106). With no further evidence of metastases, Ellis was discharged back to his cell block appearing alert, pleasant, and claiming he felt "great." (Tr. 298, 664).

An August 12, 1999 Department of Corrections medical release summary states that Ellis was not taking any medications at that time. Although his previous medical problems, such as his chronic right knee pain, hernia repair surgery, renal cell carcinoma, and the removal of his kidney, were noted, Ellis had no physical limitations. (Tr. 149). Ellis was released from prison on August 14, 1999. (Tr. 324).

During a follow-up examination on August 19, 1999, oncology specialist Faith Nathan, M.D., conducted a physical examination of Ellis and determined that he was not taking any medication, had no extremity edema,[7] and was neurologically intact. (Tr. 154-55). At Dr. Nathan's request, a CT scan was performed on September 17, 1999. It revealed an enlarged right adrenal mass consistent with metastatic disease above the recently removed right kidney. (Tr.

---

[6] *Metastasis* is "1. The transfer of disease from one organ or part to another not directly connected with it. It may be due either to the transfer of pathogenic microorganisms . . . or to transfer of cells, as in malignant tumors. The capacity to metastasize is characteristic of all malignant tumors." Dorland's Illustrated Medical Dictionary 1138 (Saunders 30th ed. 2003).

[7] *Edema* is "the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body, usually referring to demonstrable amounts in the subcutaneous tissues." It may be localized due to renal disease, among other things. Dorland's at 589.

5

150).  No other evidence of metastatic disease was seen within his abdomen or pelvis.  The CT scan also revealed pieces of metal from a 1981 gunshot blast still lodged within Ellis' abdomen. A CT scan of his brain showed no abnormalities.  (Tr. 151, 655).   In addition to noting that Ellis had his right kidney removed, Dr. Nathan also noted that Ellis had undergone a right hemicolectomy – the removal of the right half of his colon – however, there is no other mention of this in the record.  (Tr. 150).

On September 23, 1999, Dr. Nathan reported that the soft tissue mass discovered by the CT scan had been previously identified during Ellis' July 13, 1999 surgery and deemed inoperable. According to a urologist, it was more likely scar tissue from an earlier surgery.  (Tr. 144).  Although Ellis evidenced no symptoms, felt well, and did not undergo treatment in the fall of 1999, he did undergo a second CT scan on December 6, 1999, (Tr. 143) which showed that the enlarged mass in the gland above the recently removed right kidney had decreased in size from the prior study on September 17, 1999.  (Tr. 143).  There was no evidence that his kidney cancer had spread.  (Tr. 143).  When Dr. Nathan saw Ellis on December 20, 1999, he reported having no significant problems except for occasional drenching night sweats.  (Tr. 644).  Dr. Nathan could not identify a cause of the night sweats, but opined that Ellis did not appear to have any evidence of recurrent disease.  (Tr. 644).

On February 10, 2000, Joshua H. Barash, M.D., Ellis' treating physician, examined Ellis at a time when he was not receiving any cancer treatment.  (Tr. 591).  Dr. Barash noted that Ellis' renal cell carcinoma was stable and being followed by Dr. Nathan.  Ellis complained of knee pain and left elbow pain that was getting worse over time.  Besides taking Ibuprofen years before, he had not taken any anti-inflammatories.  At 210 pounds, he had gained back the twenty pounds he

6

had lost prior to his July, 1999 surgery.  (Tr. 591).  A physical exam showed he had no swelling in his knees and no pain with active movement of the knee-cap.  He had full range of motion of his knees and no ligament instability.  Dr. Barash gave him a trial dosage of Naprosyn for his pain and noted that Ellis was still drinking alcohol and smoking.  (Tr. 591).

A third CT scan on March 20, 2000, showed the right adrenal mass had increased in size since the previous study, (Tr. 565), and a biopsy found it was malignant.  (Tr. 572, 576-77).  Urologist David E. McGinnis, M.D., surgically removed Ellis' adrenal gland on June 2, 2000.  (Tr. 566-72).  The procedure took over four hours due to excessive scar tissue.  (Tr. 570).  Ellis tolerated the procedure well and was discharged on June 5, 2000.  (Tr. 567).  This surgery did not remove Ellis' renal cell carcinoma.

Later that summer, on August 22, 2000, Ellis saw Dr. McGinnis again.  This time he complained of severe sharp back pain which, although intermittent, was quite bothersome.  (Tr. 686).  Ellis was taking Percocet to manage the pain and Dr. McGinnis prescribed an additional dosage.  (Tr. 583).  An examination showed no hernia and Dr. McGinnis ordered additional testing.  (Tr. 583).  A fourth CT scan, performed on September 7, 2000, showed a thrombus, or stationary blood clot, in his hip region.  (Tr. 649).  This was treated with Coumadin, a blood thinner.  There were no abnormalities following the removal of his adrenal gland, nor were there any brain abnormalities.  (Tr. 649-50).  Twenty days later, on September 27, 2000, Ellis' back and side pain had improved since his August complaint, but was apparently painful enough to warrant another prescription of Percocet.  (Tr. 685).

On October 3, 2000, Dr. Barash saw Ellis approximately six months after their last meeting.  (Tr. 594-95).  Ellis complained of right shoulder pain, but had normal strength.  (Tr.

7

592-93, 595).  Although Ellis' knee and shoulder pain had not responded to medication, he rejected physical therapy.  (Tr. 593).  X-rays of Ellis' knee taken that day were normal.  (Tr. 590, 600-01).  Later that month, on October 17, 2000, Ellis renewed his complaints of knee pain and right shoulder pain.  (Tr. 596-98).  Although the Percocet helped, Ellis had not tried hot/cold compresses, physical therapy, or any injections. (Tr. 596).  Physical examination of the knee showed that it was normal and stable.  (Tr. 597).  Based on the findings regarding his shoulder, Dr. Barash suspected that Ellis had a rotator cuff injury.  (Tr. 597).

On October 20, 2000, Steven Levi, M.D., examined Ellis to check his cardiac status prior to receiving "IL-2," i.e. Interleukin, treatment for his renal cell cancer.[8]  (Tr. 680-81).  Ellis was cleared by Dr. Levi to proceed with the interferon and IL-2 immunotherapy based on Ellis' physical condition.  (Tr. 681).  He was physically active and climbed two or three flights of steps numerous times a day without having chest pain or shortness of breath.  He did have episodes of palpitations, but they only occurred one to two times per month and lasted only five to ten seconds and resolved spontaneously.  (Tr. 680).  He noted that he drank a half gallon of 80-proof alcohol per week.  (Tr. 680).  The only medication he was taking at that time was Coumadin. (Tr. 680).  A review of his systems and physical exam was otherwise negative.  (Tr. 681).  Ellis underwent interferon and IL-2 immunotherapy on November 8 through 10, and 13 through 17, in

---

[8] *IL-2*, *Interleukin 2, Proleukin*, or *Aldesleukin* treatment is for adults with metastatic renal cell carcinoma. Physician's Desk Reference, 1137 (59th Ed. 2005).  Drugs called cytokines (proteins that activate the immune system) have become one of the standard treatments for metastatic renal cell carcinoma.  The two cytokines most often used are interleukin-2 (IL-2) and interferon-alpha. Both cytokines cause these cancers to shrink to less than half their original size in about 20% of patients. Patients who respond to IL-2 tend to have lasting responses.  However, severe and, rarely, fatal side effects from cytokines include extreme fatigue, low blood pressure, fluid accumulation in the lungs, kidney damage, heart attacks, intestinal bleeding, and high fever and chills.  See http://www.cancer.org/docroot/CRI/content/CRI_2_4_4X_How_is_kidney_cancer_treated_22.asp?sitearea= (last visited June 15, 2005).

2000.  (Tr. 606-11).  He tolerated the treatment well.  (Tr. 606).

On November 21, 2000, Dr. Barash completed a Medical Source Statement Of Plaintiff's Ability To Do Work-Related Activities form and indicated that Ellis could perform light exertional work activities.[9]  (Tr. 587-89).  Dr. Barash reported that Ellis had the ability to frequently lift and carry up to ten pounds, stand and walk for about six hours in an eight-hour workday, and sit without any limitations.  (Tr. 587-88).  In addition, Dr. Barash reported that Ellis could occasionally climb ramps and stairs and could frequently balance, but had limitations to doing overhead activities because of problems with is right shoulder.  (Tr. 587-89).  He based these reported limitations on Ellis' problems with his right shoulder and knee pain.  (Tr. 587-88).  It is unclear whether he knew about Ellis' recent chemotherapy.

On November 27, 2000, Gaetano Cardi, M.D., Ellis' treating oncologist at the time, completed a Medical Source Statement Of Plaintiff's Ability To Do Work-Related Activities form and indicated that Ellis was capable of only a limited range of light work.  (Tr. 602-04).  Dr. Cardi justified his conclusions by citing the July 13, 1999 kidney removal, the June 2, 2000 adrenal gland removal, and the thrombus identified in September 2000.  (Tr. 603).

Treatment notes reflected that Ellis was still receiving IL-2 therapy for renal carcinoma as of January 9, 2001.  (Tr. 717).  On January 19, 2001, a study of Ellis' lower extremities showed chronic blood clot throughout the upper left leg vein.  (Tr. 701).  On April 17, 2001, treatment notes indicated that Ellis had a bad reaction to his IL-2 treatment.  (Tr. 714).  IL-2

---

[9] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b).

9

immunotherapy continued until April, 2001.  (Tr. 714).

 Robert B. Sklaroff, M.D., reviewed the evidence of record and answered interrogatories from the ALJ on June 20, 2001, but did not examine Ellis.  Although he noted the 1999 and 2000 surgeries, the IL-2 immunotherapy, and the bi-polar disorder, Dr. Sklaroff found that Ellis' impairments were not of "Listing-level" severity.[10]  (Tr. 719-22).  Dr. Skarloff suspected that Ellis' use of Percocet as a pain reliever was addictive and stated that more current medical data could be enlightening because no recent CT scan datum was provided.  (Tr. 722).

 At Ellis' most recent hearing, the ALJ's medical advisor, Dr. Strong, testified that Ellis' cancer was resolved with the removal of his kidney and adrenal gland.  (Tr. 757-58).  He explained that Ellis should not have had side effects from the interferon immunotherapy after it ended the same month it began, November 2000.  (Tr. 758-59).  However, both the ALJ and Dr. Strong apparently overlooked that Ellis' IL-2 therapy lasted until April, 2001.  Dr. Strong explained that Ellis' thrombosis was also corrected with therapy.  (Tr. 758).  Dr. Strong also testified that there were no objective findings to support the limitations reported by Dr. Barash and that although Ellis alleged shoulder and knee pain, nothing significant could be found to support the causes of such pain.  (Tr. 764-69).  Dr. Strong testified that, during the recovery period immediately following Ellis' surgeries, Ellis would be expected to have difficulty lifting 50 pounds occasionally and 25 pounds frequently, however, such periods may be expected to

---

 [10]  The Listing of Impairments is a regulatory device used to streamline the decision-making process by identifying those claimants whose medical impairments are so severe that they would be found disabled regardless of their vocational background.  Sullivan v. Zebley, 493 U.S. 521, 532 (1990).  The listing defines impairments that would prevent an adult, regardless of his age, education, or work experience, from performing "any" gainful activity, not just "substantial" gainful activity.  See 20 C.F.R. §§ 404.1525a, 416.925a (2004) (purpose of the listings is to describe impairments "severe enough to prevent a person from doing any gainful activity").  The listing was designed to operate as a presumption of disability making further inquiry unnecessary.  Zebley, 493 U.S. at 532.  To be found presumptively disabled, a claimant must satisfy the criteria under the Listing.  Id. at 530.

10

take weeks or months, but not years. (Tr. 763). Although Dr. Strong said he agreed with Drs. Cardi's and Barash's medical source statements, he did so only because they were treating doctors. (Tr. 767-70). When asked if the objective medical evidence substantiated such limitations, Dr. Strong stated he was unaware of evidence indicating an ongoing problem, but recognized that a difficult surgery could lead to a longer recovery period. (Tr. 769-70).

Dr. Saul, the ALJ's psychiatric medical advisor, also testified at the most recent hearing that he suspected that Ellis' complaints of pain were an attempt to seek out pain medications (such as Percocet) based on his history of drug abuse. (Tr. 777).

During the relevant period, Ellis was able to drive and use public transportation such as the subway. (Tr. 28). In January 2001, he claimed he spent his days watching television, reading for a couple of hours, and watching his grandchildren. (Tr. 40-42). He could prepare his own meals and pick up after himself. (Tr. 41). He and his son had their own private recording studio in the house and were "pretty active in that." (Tr. 42-43). He had no problems taking care of personal needs. (Tr. 91).

After reviewing this evidence, the ALJ concluded that Ellis had the following residual functional capacity: "medium exertional work with little interaction with the public and other workers and simple and routine tasks in a low stress environment."[11] (Tr. 747). With the help of the VE, the ALJ determined that Ellis could perform work as a production laborer or a commercial cleaner. (Tr. 747). Therefore, the ALJ determined that Ellis was not disabled "at any time through July 31, 2001." (Tr. 747).

---

[11] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 416.967(c).

DISCUSSION

The determining factor is whether Ellis can perform light work or medium work. Normally, a finding that Ellis could perform light work means that he is not disabled.  However, given Ellis' advanced age, high school education, and unskilled work background, a determination that he could do only light work would result in a finding of disabled under 20 C.F.R. Pt. 404, Subpart P, Appendix 2, §§ 202.04, 203.13.[12]  Conversely, the ALJ's determination that Ellis could perform medium work means that he is not disabled under the regulations.  Id.

A.  Legal Standards

I must determine whether substantial evidence supports the Commissioner's final decision.  42 U.S.C. § 405(g); Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  The factual findings of the Commissioner must be accepted as conclusive, provided that they are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 390 (1971) (citing 42 U.S.C. § 405(g)); Rutherford, 399 F.3d at 552.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 401 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Reefer v. Barnhart, 326 F.3d 376, 379 (3d Cir. 2003). It is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence."  Rutherford, 399 F.3d at 552.  I may not weigh the evidence or substitute my own conclusions for that of the ALJ.  Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).  If the

---

[12]  The Social Security Regulations provide that someone, such as Ellis, who is of advanced age, has a high school education that does not provide for direct entry into skilled work, whose previous work was unskilled, and is limited to light work is, therefore, disabled under 20 C.F.R. Pt. 404, Subpart P, App. 2 § 202.04.

12

ALJ's findings of fact are supported by substantial evidence, I am bound by those findings, even if I would have decided the factual inquiry differently.  Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001).  At the same time, however, I must remain mindful that "leniency [should] be shown in establishing claimant's disability."  Reefer, 326 F.3d at 379 (quoting Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979)).

The Social Security Administration has adopted a system of sequential analysis for the evaluation of disability claims.  This five-step evaluation is codified at 20 C.F.R. §§ 404.1520, 416.920.[13]  A claimant is disabled if she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  20 C.F.R. §§ 404.1520, 416.905.  The claimant satisfies his burden by showing an inability to return to her past relevant work.  Rutherford, 399 F.3d at 551.  Once this

---

[13]These steps are summarized as follows:

1.  If the claimant is working or doing substantial gainful activity, a finding of not disabled is directed.  If not, proceed to Step 2.  20 C.F.R. §§ 404.1520(b), 416.920(b).

2.  If the claimant is found not to have a severe impairment which significantly limits his or her physical or mental ability to do basic work activity, a finding of not disabled is directed.  If there is a severe impairment, proceed to Step 3.  20 C.F.R. §§ 404.1520(c), 416.920(c).

3.  If the impairment meets or equals criteria for a listed impairment or impairments in Appendix 1 of Subpart P of Part 404 of 20 C.F.R., a finding of disabled is directed.  If not, proceed to Step 4.  20 C.F.R. §§ 404.1520(d),  416.920(d).

4.  If the claimant retains residual functional capacity to perform past relevant work, a finding of not disabled is directed.  If it is determined that the claimant cannot do the kind of work he or she performed in the past, proceed to Step 5.  20 C.F.R. §§ 404.1520(e), 416.920(e).

5.  The Commissioner will then consider the claimant's residual functional capacity, age, education, and past work experience in conjunction with the criteria listed in Appendix 2 to determine if the claimant is or is not disabled.  20 C.F.R. §§ 404.1520(f), 416.920(f).

See also Knepp v. Apfel, 204 F.3d 78, 83-84 (3d Cir. 2000) (citing Santise v. Schweiker, 676 F.2d 925, 926-27 (3d Cir. 1982)).

showing is made, the burden of proof shifts to the Commissioner to show that the claimant, given her age, education, and work experience, has the ability to perform specific jobs that exist in the economy.  20 C.F.R. §§ 404.1520, 416.920; see Rutherford, 399 F.3d at 551.

The ALJ may not make speculative inferences from medical evidence, see e.g., Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981), but may reject conflicting medical evidence. Williams v. Sullivan, 970 F.2d 1178, 1187 (3d Cir. 1992).  When a conflict in the evidence exists, the ALJ may choose whom to credit, but "cannot reject evidence for no reason or for the wrong reason."  Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993); accord Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).  The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects.  See Stewart v. Secretary of H.E.W., 714 F.2d 287, 290 (3d. Cir. 1983).

The regulations provide that a treating physician's opinion is entitled to controlling weight when it is supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004).  Although the treating physician's conclusion should be accorded great weight, it may be rejected if it is unsupported by sufficient clinical data,  Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985), or contradicted by other medical evidence.  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999).  "While the ALJ is, of course, not bound to accept physicians' conclusions, he [or she] may not reject them unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected."  Kent v. Schweiker, 710 F.2d 110, 115 n.4 (3d Cir. 1983).  Thus, the ALJ may choose to reject a treating physician's assessment if it conflicts with other medical evidence, the ALJ

14

clearly explains his reasons for rejecting the assessment, and he makes a clear record of his decision.  See generally Rivera v. Barnhart, 2005 WL 713347 at *5 (E.D. Pa. March 24, 2005) (Giles, C.J.) (collecting authorities); see generally Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991).  Similarly, the ALJ must seriously consider subjective complaints of pain, which may support a claim for benefits, especially when the complaints are supported by medical evidence.  Smith, 637 F.2d at 972; Taylor v. Harris, 667 F.2d 412 (3d Cir. 1981); see also Mason, 994 F.2d at 1067.

      B. Analysis

      In determining whether Ellis could perform light or medium level work, the central issue is whether substantial evidence supports the ALJ's rejection of Ellis' treating physicians' assessments in favor of the ALJ's determination that Ellis was not disabled prior to August 1, 2001.[14]  In November 2000 both treating physicians found that Ellis was limited to less than the full range of light work.  To correct this error, Ellis requests that this matter be remanded.  I agree for the following reasons.

      As the Commissioner cautions, my role is to assess the record for substantial evidence, not substitute my judgment for that of the ALJ, who observed the witnesses, the claimant, and reviewed the medical evidence with the assistance of highly qualified experts.  Although it is a

---

[14]  As a peripheral matter, Ellis incorrectly argues that the ALJ should have considered the period from July 13, 1999, his alleged onset date, to July 31, 2001 rather than the period from December 1999, when Ellis applied for benefits, through July 31, 2001.  (Pl.'s Br. at 15-17).  The ALJ correctly selected December 10, 1999 as the starting point of his analysis because that is the date Ellis applied for SSI benefits and SSI benefits are not payable for a period prior to claimant's application.  20 C.F.R. § 416.335 ("If you file an application [for SSI] after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month."); Torres v. Chater, 125 F.3d 166, 171 n.1 (3d Cir. 1997).  Therefore, Ellis' argument that the ALJ committed reversible error by not considering the period between July 13, 1999 and December 10, 1999 is without merit.

close issue, the ALJ failed to cull substantial evidence to properly refute the assessments of residual functional capacity of Ellis' treating physician, Dr. Cardi.

First, the ALJ's opinion failed to fully consider the effect of Ellis' IL-2 treatment on his residual functional capacity.  After concluding that Ellis' cancer was in remission, the ALJ stated that, "[r]egarding claimant's treatment for Hepatitis C, Interferon therapy was terminated on [sic] November 2000; with notations that claimant tolerated the treatment well.  Considering the treatment was less than 12 months this cannot be considered a severe impairment."  (Tr. 744).  This statement is incorrect.  There is no indication that Ellis' interferon therapy was employed for Hepatitis C.  Rather, the medical records establish that interferon was used, in combination with IL-2, to treat Ellis' renal cell carcinoma.  Furthermore, while it is technically correct to state that the interferon therapy stopped in November 2000, the ALJ apparently overlooked the continuing IL-2 immunotherapy cancer treatment through April 2001.  December 13, 2000 University of Pennsylvania Department of Psychiatry notes indicate that Ellis received an IL-2 regimen once a month.  (Tr. 703).  The January 9, 2001 treatment note stated that Ellis was still undergoing IL-2 treatment for his renal cell carcinoma.  (Tr. 717).  On April 3, 2001, a treatment note reflected a discussion with Dr. Cardi referring to a blood clot and that there was to be "absolutely no immunotherapy," such as IL-2 treatment, at that time.  (Tr. 716).  Apparently, the April 3, 2000 discussion was not heeded because just two weeks later, the April 17, 2001 treatment note from Jefferson Family Medicine referred to a bad reaction to IL-2.  (Tr. 714).  The ALJ, therefore, appears to have misperceived the purpose for, and length of, Ellis' interferon and IL-2 immunotherapy.

Failure to fully investigate the IL-2 treatment's duration affects the assessment whether

Ellis would be able to do medium-level work.  By concluding that Ellis' immunotherapy ended in November without looking at the treatment notes that indicated otherwise, the ALJ failed to consider the effect of the IL-2 treatment on Ellis' residual functional capacity.  Although Ellis tolerated the November 9, 2000 treatment well, he was still discharged with an intravenous catheter attached.  After his April 2001 IL-2 treatment he had a "bad rxn (reaction)."[15]  Certainly, an intravenous catheter attached to a person undergoing chemotherapy, as well as an adverse reaction to such chemotherapy, could affect that person's ability to lift 50 pounds at a time, 25 pounds frequently, and stand regularly throughout the workday as required to perform medium work.  In fact, Dr. Cardi's November 27, 2000 assessment, which was performed two weeks after Ellis' chemotherapy, limited Ellis to less than a full range of light work.

The ALJ's conclusion that the treatment did not last 12 months, and therefore, cannot be the basis of a disability is also affected by the longer duration of IL-2 therapy that Ellis received. Currently, Ellis' disability onset date is August 1, 2001.  Having a bad reaction to the IL-2 treatment only three months earlier could potentially lower Ellis' residual functional capacity and advance his disability onset date.  Unfortunately, the ALJ did not consider these possibilities because he mistakenly concluded that Ellis' immunotherapy had ended in November, 2000.

Second, the ALJ improperly rejected the opinions of Ellis' treating physicians by mis-characterizing the testimony of Dr. Strong.  Although opinions of treating physician's are entitled to greater deference than those of non-treating physicians, the ALJ may choose whom to credit, as long as he supports his decision with valid reasons and does not make speculative

---

[15] Unfortunately, Ellis' "bad reaction" is not described in further detail.

interpretations or inject improper lay opinion.  See Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429 (ALJ may reject treating physician opinion based on contrary medical evidence or may give it some weight depending on extent of physician's supporting explanations).

Here, the ALJ credited Dr. Strong's testimony as the basis for rejecting the opinions of treating physicians, Drs. Barash and Cardi, who concluded that Ellis was limited to less than a full range of light work.  In doing so, the ALJ stated:

> Dr. Strong, the medical expert who appeared at the March 22, 2004 hearing, testified that the claimant's cancer was resolved with the removal of the kidney and adrenal gland.  Also, that the claimant's x-rays are negative for arthritic abnormalities.  Though the claimant alleges shoulder and knee pain nothing can be found to support the causes of such pain.  While Dr. Strong stated his agreement with Dr. Barash's medical source statement, he made it clear that he did so because Dr. Barash is a treating doctor.  When asked if the objective medical evidence substantiated such severe limitations the doctor said it did not.  Dr. Barash's opinion of the capabilities is also not supported by the other objective medical evidence such as the x-rays or any other diagnostic tests.  Similar testimony was provided regarding the medical source statement of Dr. Cardi.  Therefore, contrary to claimant's attorney's opinion that these doctors' medical sources statements are supported by the medical record, Dr. Strong disagrees, and so do I.

(Tr. 743-44).  Dr. Strong's testimony, however, is not as unequivocal as the ALJ suggests, and it fails to constitute substantial evidence sufficient to rebut the residual functional capacity assessment of Dr. Cardi.[16]

For example, the ALJ erroneously stated that, "Dr. Strong . . . testified that the claimant's

---

[16] Ellis also argues that the ALJ mis-characterized Dr. Strong's testimony to reject Dr. Barash's opinion. Dr. Barash's assessment was based, as stated, on both history and physical, musculoskeletal impairments.  Although the ALJ's statement that "nothing" could be found to support Ellis' knee and shoulder pain is slightly hyperbolic, Dr. Strong's testified that there were no objective findings to support the limitations due to chronic shoulder and knee pain.  Dr. Strong's testimony is supported by objective medical evidence such as x-rays, other diagnostic tests, and Dr. Sklaroff's opinion that Ellis only complained of pain in his knees, shoulder, and arm to get Percocet or other narcotic-type medication consistent with his past abuse of drugs.  (Tr. 719-22, 756-78).  The ALJ, therefore, had substantial medical evidence to reject the opinion of treating physician, Dr. Barash.

cancer was resolved with the removal of the kidney and adrenal gland." (Tr. 743). As discussed above, Ellis underwent immunotherapy from November 2000 through, at least, April 2001 to treat his renal cell carcinoma. The renal cell carcinoma treatment appears to have been required because the cancer from his kidney had spread or metastasticized. Dr. Strong recognized this by referring to Ellis' metastatic disease, the 1999 kidney removal, the June 2000 adrenalectomy, and the November 2000 immunotherapy as conditions that lasted more than the required 12 months and imposed physical restrictions.[17] (Tr. 758). Dr. Strong, therefore, acknowledged that Ellis' renal cell carcinoma was not fully resolved by the removal of the kidney and adrenal gland; otherwise, the immunotherapy would not have been necessary. Viewed as such, Dr. Strong's testimony does not contradict evidence from Ellis' treating physicians.

Although Dr. Strong testified that he had reviewed the medical record, it appears that he accepted the ALJ's erroneous representation that Ellis' immunotherapy had ended in November, 2000. (Tr. 758). By doing so, Dr. Strong's testimony was based on an incomplete view of Ellis' cancer treatment history. This is especially important considering that Dr. Strong's testimony was otherwise consistent with, and deferential to, the opinion of Ellis' treating oncologist, Dr. Cardi. On November 27, 2000, Dr. Cardi concluded that Ellis was limited to lifting and carrying less than ten pounds and never climbing ramps or stairs. (Tr. 602-04). This conclusion is

---

[17] The ALJ's hearing transcript reports the following exchange on page 758:

Q: Was there any condition that lasted for the required 12 months, in your opinion?
A (Dr. Strong): Well, . . . yes. He . . . had his metastatic disease of his nephrectomy and, and the adrenalectomy.
Q: Okay. Would that impose any, any type of physical restriction on an individual?
A: It . . . would. The patient was receiving interferon treatments during this period of time.
Q: Um-hum.
A: . . . [S]ome patients can tolerate it, and some patients can find it very debilitating.

consistent with a finding that Ellis was limited to less than the full range of light work.  (Tr. 602-04).  To support this conclusion, Dr. Cardi cited the July 13, 1999 surgery removing Ellis' cancerous right kidney, the June 2, 2000 surgery removing Ellis' cancerous right adrenal gland, and the September 2000 identification of Ellis' blood clot.  (Tr. 603).  Although it is not specifically noted, Dr. Cardi's assessment was given just two weeks after Ellis' first chemotherapy treatment for his renal cell carcinoma.  Given Ellis' advanced age, high school education, and work background, Dr. Cardi's findings, if credited, would provide the basis for a finding of disabled.  20 C.F.R. Pt. 404, Subpart P, Appendix 2, §§ 201.01/02.

The ALJ's attempt to discredit Dr. Cardi's opinion is troubling for another reason.  The ALJ stated, "[w]hile Dr. Strong stated his agreement with Dr. Barash's Medical Source Statement, he made it clear that he did so because Dr. Barash is a treating physician.  When asked if the objective medical evidence substantiated such severe limitations, the doctor said it did not. . . . Similar testimony was provided regarding the medical source statement of Dr. Cardi."  (Tr. 743-44).  Contrary to the ALJ's assertion, however, the question whether "objective medical evidence substantiated such severe limitations" was not asked.  The closest question was whether Dr. Strong noticed "any explanation there as to why the limitations would be so extreme?"  (Tr. 769).  Dr. Strong's non-answer defers to the treating physician: "It's hard to give a definite answer . . . on an individual . . . you have not examined.  You can . . . give generalizations, but to give a specific answer, I could not."  (Tr. 769).  Dr. Strong then stated that he did not see anything that would specifically give rise to an ongoing problem for Ellis.

Dr. Strong's agreement with Dr. Cardi's assessment of Ellis' condition on November 27, 2000, and his otherwise equivocal testimony regarding the treating physicians' conclusions,

cannot be read as a contradictory advisory opinion sufficient to outweigh a treating physician's

opinion.  See Plummer, 186 F.3d at 429.  This is especially true considering that Dr. Strong's

testimony is consistent with Dr. Cardi's assessment regarding Ellis' response to the two

surgeries:

> Q: Okay.  Looking at this period between these two – between the July '99 operation and the surgery of June 2000, can you conclude, from a combination of the prior trauma, prior surgery, and the period of convalescence or healing from these operations, if there'd be any limitation on lifting and carrying for the person with this particular history during this period?
>
> A: There would be limitations on lifting and carrying.
>
> Q: Okay. Would that be, at least in part, due to the effect on the abdominal muscles?
>
> A: Correct.
>
> Q: Okay.  The – there also was mention, I believe, in the period after the June operation, of complaints of flank pain, or pain at the operative site?
>
> A: Correct.
>
> Q: Okay.  Would that be another indication of limited lifting –
>
> A: Yes.
>
> Q:  – or an indication that – making a relationship between that and lifting?
>
> A: Yes.
>
> Q: Okay.  Would it be fair to say that somebody with that particular condition during that period of time would have difficulty lifting 50 pounds?
>
> A: Definitely.
>
> Q: 25 frequently?
>
> A: Definitely.
>
> ALJ: For what period of time?  I mean, is it a permanent limitation?
>
> A: Is it permanent?  No.  Until his, his surgical procedures were, were completely healed, and, and, and that could take weeks to months.
>
> ALJ: But not years?
>
> A: Can it take years?  I don't think it could take years.

(Tr. 762-63).  The issue in this case is not only whether Ellis felt reasonably well after surgery, as

the Commissioner suggests, but whether he could sustain work at the medium exertional level on a regular and continuing basis.  SSR 96-8p.    After measuring the ALJ's conclusion against the weak supporting testimony of Dr. Strong, it appears that the ALJ has mis-characterized Dr. Strong's testimony to support his conclusion that Ellis was capable of performing medium work. Ellis' treating physician, Dr. Cardi, as well as the ALJ's medical advisor, Dr. Strong, concluded that he could not, at least not while he was undergoing surgery, recovering from surgery, and undergoing chemotherapy.  With regard to the effects of cancer and cancer treatment, Ellis' case must be remanded for a calculation of a reasonable recovery period before being adjudicated that he was able to perform the physical demands of medium work.

Accordingly, I make the following:

## R E C O M M E N D A T I O N

AND NOW, this          day of June, 2005, IT IS RESPECTFULLY RECOMMENDED that Ellis' motion for summary judgment be GRANTED, and the Commissioner's motion for summary judgment be DENIED and that the case be REMANDED to the Commissioner for further proceedings consistent with this Report and Recommendation.

BY THE COURT:

_____
TIMOTHY R. RICE
U.S. MAGISTRATE JUDGE